## CHARLES F. LEEDS et al.

### *v.*

## RICHARD A. F. PENROSE et al.

1. As this case is presented, under the amended answer, it appears that both Leeds and Penrose are guilty of laches, or if the one was too slow in commencing suit, the other was too aggressive in making the improvements for which he claims compensation, after the notice which he had. The complainants are entitled to a conveyance of the lands as prayed for, and Penrose is entitled to' be reimbursed to the extent that the expenditures made by him resulted in permanent improvements. The improvements consist in changing very low, wet land into building lots, the value of which has been fixed by the testimony offered by Penrose. The complainants can reimburse by paying him the amount found to be due for such improvements, either in cash or by releasing to him the lots named.

2. *Query :* Can one in such case make very radical changes, and justly claim compensation for them as against the true owner ?

*Mr. J. J. Crandall,* for complainants.

*Mr. H. M. Cooper* and *Mr. D. J. Pancoast,* for defendants.

BIRD, V. C.

This case has once been heard as to the right of the complainants to a deed of conveyance from the defendant, Penrose, for a certain parcel of land named in the bill. The opinion of the court was that the complainants were entitled to the relief asked for. See *6 Cent. Rep. 545.*

After the views of the court were understood by the defendant, Penrose, he came in and asked leave to amend his answer, so as to show that he had made very valuable permanent improvements on the land in question, amounting to, in all, more than $9,000, and in the full belief that the lands upon which they were made were his own. It was thought to be more equitable to allow him to make his defence on this point, even though he had first ventured to wait the action of the court on the question of title. If there was really good faith in his great outlay, it

would not be very satisfactory to allow the complainants to have all the benefits thereof. I do not wish to be understood as intimating that it is equitable in every case where large improvements have been thus made, to allow for them.

I think the true inquiry is, Did the defendant make these improvements in that good faith which the law requires, or did he do it after such notice as will impose all the risk on him? It would be highly inequitable to sustain him in the latter view, should the latter view be supported by the facts.

In a complete and satisfactory sense, the act of the defendant is not *bona fide*, or, as one text writer expresses it, he was not wholly innocent; for the defendant knew of this claim to this land by the complainants, as I have stated. See *6 Cent. Rep. 546*. One of the complainants absolutely refused to execute a deed for the larger tract to the defendant, Penrose, until the deed to the complainants, for the lot in question, was executed by Penrose. It should be remembered that that deed was executed by Penrose, and then the complainants executed the deed according to their parol agreement, for the whole premises, including the parcel now claimed by them, back from Penrose to them. But when the deed to Penrose was delivered, the deed from him to complainants was not delivered, although, as stated, it had been prepared and executed by Penrose. And when one of the complainants demanded it of Guillou, the agent of Penrose, he refused to deliver it, but afterwards, on his own motion and without knowledge of the complainants, handed another deed to the clerk of the county, and ordered him to record it; and when it was recorded, he mailed it to Mrs. Leeds, the mother of two of the complainants and the aunt of the other two. She had been acting for them in all this transaction. She had delivered the deed for the Leeds tract to Guillou, and demanded for them the deed which she knew had been executed for them in return. Hence, it was not improper to send the deed to her. This deed she retained, taking it to her counsel at once, and advising with him concerning the rights of the defendants in the matter.

In a very few days after the recording of his deed, but whether before it reached Mrs. Leeds or not does not appear, Penrose

ordered his men to go to work on the lands now claimed by the complainants. The lands were low and wet, often covered by the tides. The object Penrose had in view was the improvement of the whole tract, so as to be suitable for building lots. The location is so near to the thriving city of Atlantic City that it may be said to be a suburb thereof, if not a part thereof, in case it shall be built upon as contemplated. The parcel which the complainants claim, and which I think the defendants would be least pleased to surrender, lies next to Atlantic City, and, as I understand the evidence, must be crossed in going to that place from the balance of the tract, if the route be made by the most direct way.

The first work done by Penrose was to cut a ditch or canal on the west side of the line of the small narrow strip which he had deeded back to the complainants, eleven feet in width and four feet in depth. It does not appear that this was so dug on purpose to sever the small tract from the other, which was to be improved, but it has that effect. It is expected that this canal will carry water most of the time. The one chief object in cutting it was to get dirt to fill up a small creek which ran through the tract which the complainants claim. This canal opens into Thoroughfare Gap. The act of Penrose made the said parcel so reconveyed inaccessible, except by bridges, and that, too, only over approaches resting on lands of Penrose. Whether, under such a conveyance, the complainants could claim access to that small strip by necessity, over the lands of Penrose, may, under the circumstances of the case, be a question. The act of conveyance and reconveyance being one and the same, and under one agreement, Penrose might well claim that no such right was intended, for if it had been, it would have been reserved. But, however this may be, the first movement by Penrose was, however unintentional it may have been on his part, to make it necessary for the complainants to build bridges in order to get to and from the narrow strip so conveyed back to them as aforesaid.

Penrose proceeded with his improvements. He built a wharf on Thoroughfare Gap, three hundred and fifty feet in length, and

Leeds *v.* Penrose.

graded and plotted all of the land in dispute into streets and lots, extending the streets from his own parcel, so conveyed to him by the Leedses, over the whole, to the borders of said canal. Thus he improved about sixty-three acres, while the quantity in dispute is about four. About three years passed before the complainants filed their bill for relief.

Two questions are presented. *First*, did the defendant proceed in the honest belief that the title to this land was in him? And, *secondly*, were the complainants guilty of laches in bringing their suit?

In determining the question of *bona fides*, we must be governed by the principles of human action, which are supposed to control men of prudence and sound understanding. Would a man of prudence have proceeded to expend over $9,000, after the unmistakable notices which were given to Penrose, through his agent Guillou? I conclude not. It seems to me that Penrose had such notice as any man was bound to respect, in the refusal of one of the complainants to execute a deed to Penrose, until Penrose had actually executed a deed to the complainants for the tract in question. This was plenary evidence of the extent of their claim. And it is very important to notice that Penrose recognized that claim to the fullest extent by executing that deed, although Guillou, his agent, destroyed it afterwards. This fact is of very great consequence in settling or in balancing the rights of these parties. This distinct claim, so broadly acknowledged by Penrose, greatly qualifies the claim of Penrose to innocency. Of course, in such cases, the complaining party may so act, or may so omit or neglect to act, as to bar him from setting up such qualifying acts. And, it may be within the authorities to say, that, in such case, the negligence should be attended with some aggravating circumstance before the party is chargeable with such laches as to estop him. I think the manifest aim of the courts is ever to uphold and to give the first place to fundamental property rights. *Crest* v. *Jack, 3 Watts 238 (27 Am. Dec. 353)*. Also, see some of the limitations to this rule, as stated in the valuable note on page 355 of the last reference.

And this suggestion makes it important to keep in mind the

conduct of the other side.   For while Penrose commenced work
so soon, and made such extensive changes and improvements,.
continuing it from day to day, all was done in the presence of
the complainants or of Mrs. Leeds, the principal actor in their
behalf.   So that while in one aspect of the case there is no little
evidence to show that Penrose was, in the eye of the law, taking.
great risks in expending his money on lands which he knew the
complainants claimed, yet it must be admitted, that at this stage,.
the complainants knew that Penrose had a deed from themselves
for this land, and therefore had the title.   And besides this,
although it is not as satisfactory as I should like it, yet it is of
some force, that Penrose made a deed, transferring the title to
the small parcel alluded to above to the complainants, which he
insisted was all that they were entitled to under the agreement;
and, as appears, after recording this deed, he sent it to Mrs.
Leeds by mail, and it reached her in due course.   True, all this
was without the shadow of authority from the complainants.
And, although I have found that this was not according to the
agreement, the fact that this deed was not returned to Penrose
immediately cannot but have some weight in the consideration
of the rights of the parties.   Yet, in one particular, it was a
point of the highest prudence for them to retain this deed, in case
of contention, as evidence of an agreement to reconvey some por-
tion of the land.

Still it seems to me it was now their plain duty to promptly
notify Penrose that they would not accept that deed as perform-
ance of the agreement.   The fact that they did not had a ten-
dency, and most reasonably, to induce a sense of security on his
part beyond what they intended but which they are accountable
for.

But all this is again qualified by the undisputed fact that Mrs.
Leeds, in behalf of the complainants, called on one of the work-
men employed by Penrose, and while at work on the land in
question, and warned him that he was digging on her property,
and assured him that she was the owner of it.   This was on the
third day after the first work was done.   On the next day the
workman informed Guillou, the agent of Penrose, and who was

superintending all that was done, of what Mrs. Leeds had said, to which he replied : " O, yes, she has a little three-cornered piece over here." Hence it will be seen that, immediately after he had mailed to Mrs. Leeds the deed for this little three-cornered piece, he begun his improvements on the other lands claimed by the complainants, and that he was directly warned of that claim. Mrs. Leeds also said to this workman that she intended to commence a suit against them. This was all communicated to Guillou. It is also in evidence that, sometime after this, Mrs. Leeds called again at the place where the work was going on and said to another laborer that she intended to serve an injunction on them, meaning on Guillou, against going on with the work. But these warnings were unheeded by the defendant. He continued his work until he had, as he claims, expended over $9,000.

Now, after these statements, I think it will appear to all that the case is peculiar, in that fault or negligence is justly chargeable to both. For Penrose knew of the Leedses' claim, and yet pressed on to the expenditure of very large sums of money; while, on the other hand, Mrs. Leeds knew that Penrose had executed and mailed to her a deed for the land that he intended to insist on was all the defendants were entitled to, and which, by their own deed to him, left all the balance of the tract in Penrose; and she also knew that Penrose was daily asserting his claim to the balance, by the above-named act of ownership. These things the complainants knew, and yet allowed three years to pass before commencing their suit for the exact specific performance of the agreement. It thus appears, and the case shows, that the complainants received this deed from Penrose, and did not return it, nor did they take any decided steps to assert their rights, beyond the warnings and claims made to the laborers above mentioned. If complainants were slow in bringing their suit, the defendant was too aggressive in making his alleged improvements after notice.

I think this makes a fair case for equitable consideration. There is no dispute as to the law. Counsel for complainants insisted that they had a right to rely on the notice of their claim,

both as it depended on the original agreement and on the admitted claim made to Guillou by Mrs. Leeds, and on the fact that Penrose executed one deed for the tract claimed, and also on the unqualified notice to Mason, the workman, on the third day after the work was begun. And counsel says, these things being so, the complainants are protected from all invasion, by the fundamental property rights which are sacred under every code of laws.

While these considerations have great force, and are universally adjudged to be of the highest value, they have their bounds in courts of equity. Parties who have undisputed rights may, by their neglect or omission of that which equity considers a duty, forfeit those rights, or impair or qualify their right to assert them.

I conclude that negligence may safely be imputed to both. I also conclude that each is entitled to relief—the complainants to the land they claim, and the defendants to fair compensation for such improvements as I am satisfied are permanent.

What improvements were made that were really permanent? This is not so easy for me to determine. Are they permanent in the legal or equitable sense of the term? Does the law go so far as to permit the possessor of land, in such case, to make whatever changes his fancy may suggest, and at any cost, and then to charge for them as improvements, as against the true owner, whether such changes were in accordance with the views of the true owner or not, or whether he contemplated any changes at all or not? Is it said that this land can be disposed of by the complainants at advanced prices, and to that extent it has been improved? This suggestion brings out the difficulty more distinctly. Can the court say to any suitor in such case, You must accept the work which your adversary has cut out for you, or sell your inheritance, since it can now be sold for enough to reimburse him for his outlay? Carrying a rule of law, which has been so often applied, to this extent, what advantage will enable the court to compel complainants to accept whatever alterations a *bona fide* possessor may choose to make, however foreign they may be to the intentions, or contrary to the interests, of the

owner? For example, would our law sustain a claim as a per-
manent improvement, in a case where the owner had always kept
land as meadow or pasture, and the possessor should convert it
into farm land, and call it an improvement? Or should the pos-
sessor tear down an old and valued homestead and remove all
the surrounding shrubbery and other monuments of a past age,
and which the true owner was content to preserve, and should
construct on the site thereof costly modern buildings, in all
worth twenty times the old habitation, would it be equitable for
the court to say to the owner that he must pay for the things?

It seems to me that this case and these inquiries suggest the
true spirit of the equitable rule, applicable in such cases; and
that that rule requires the improvements to have been made in
accordance with the design of the owner; and, if not so made,
the possessor makes them at his peril, or at least, he is entirely
dependent on such considerations as the court may feel called on
to invoke to protect the owner from loss. In other words, his
attitude is so doubtful that the court is justified in casting all the
risk of possible loss on him. Take the case in hand: the changes
may turn out to be improvements, but no one can so affirm with
the certainty that he could in case a suitable new barn or dwelling-
house had been erected on a farm. I think that, in every such
case, the court must be satisfied that the changes are, indeed, such
improvements as can be appreciated by the real owner. They
must appear to be substantial benefits to him; something that
will be profitable, or will yield an income or interest to him in
the ordinary and customary management of the estate. In other
words, in such case, the court will cast the risk of loss on the
party which ventured to take the greater risk.

Applying these views, which seem to me to be so just, to this
case, I cannot allow the defendant for all of his expenditures,
simply because he has made them, and, in making them, has
made very great changes in the face of the property of the com-
plainants. It may well be that it will be quite impossible for
the complainants to realize anything like such amounts for their
land. This doubt is so serious that it should be borne by the
defendant whose conduct created the doubt. I can only allow him

Leeds *v.* Penrose.

$6,000, and I am obliged to say that I cannot give very satisfactory reasons for fixing the sum so high. There is no certain testimony to assure me that the complainants can realize that sum by the sale of the entire tract, or that the court could, were the court to declare that sum a lien thereon, and attempt to raise money by a judicial sale, accept the testimony of Guillou, who says that these improvements have made the land worth $16,000. I also understood him to say that it would bring $6,000 in the market. But the whole case shows that Guillou is very deeply interested. And it is not too much to say, that so frequently have the lands, or portions of them, on which many of the seaside resorts have been built, or are being built, been before the courts of this State, that they have just reason in every cause, when the question of value is presented, to act on the conviction that all of these lands are held at speculative prices, and also that every such investment is a speculation, as most evidently this, on the part of Penrose, was. What power has the court to compel the complainants to share in this speculation with Penrose? And a most satisfactory explanation of the truth here suggested is in the case which I am now considering. The man offered by the defendants shows that Penrose has graded, laid out in streets and lots sixty-two acres, and that the whole number of lots is two hundred and twenty-eight, of which a large number have been in the market two to three years, and yet not more than one-tenth of them has been sold. Nor is it at all unreasonable to say that there can be no certainty that these alleged improvements are permanent in the just sense of that term. The evidence is that the land is so low that the great tides of the ocean sweep over it, to protect it against which the ditch or canal which has been named, and also one a great deal larger, were dug by Penrose. By a resort to these devices the earth was procured to raise embankments to resist the waters and to raise a foothold above the low, wet and marshy soil everywhere abounding, and also to open channels to carry off the waters when they should overflow. Now, the suggestion of these facts brings forward the truth that these improvements, so made, on such a foundation, in such a frail manner, with the intention of resisting one of the

mightiest forces in nature, and to which they are subject to daily attack, are liable to instant and rapid depreciation. A few years or months may prove that such generous outlays have been without profit and without wisdom. To these considerations is to be added the great injury done to the lands of the complainants by cutting the canal through it.

The complainants can pay the $6,000 in money or in land at the rates of value given by Guillou. He swears that he sold for Penrose certain lots for $1,250, and that the Leedses' lots are worth that sum. To sustain this view, he said that he was offered $900 apiece for Nos. 22 and 23. According to the testimony Penrose has sold lot No. 31, as marked on his map, one-third of which is included in the Leedses' claim. For this he received $1,000. He should be charged with the one-third of this sum. The map also shows that, as the land has been plotted, half of lot No. 161 is made up of the Leedses' land. Penrose should allow $625 for this half. For the two parts of lots so named, the complainants must execute a release to Penrose of all claim or demand, and, in case they elect so to do, pay the balance of the $6,000 in cash. The amount still due to Penrose will be $5,041.67. If the complainants do not elect to pay the whole of this in cash, then they must pay $41.67 in cash, and execute a deed of release to the defendant, Penrose, for lots Nos. 29, 162, 178 and 179. These are all adjoining the Penrose tract, and lie, in the order named, beginning with No. 29, on Thoroughfare Gap. If my estimate of the fair value of the alleged improvements is correct, then on the basis of the value of the Leedses' lots, as fixed by Guillou, the agent of Penrose, the above assures him full compensation for the improvements that can reasonably be claimed to be permanent.

Penrose will be required, by such deed as the Leedses conveyed the whole tract to him, to convey to them the tract which they claim by their bill, free from all liens or encumbrances which may have been imposed by his instrumentality. He will be required to deliver such deed to the solicitor of the complainants, at his office in Camden, on the thirtieth day after a copy of the decree in this cause shall have been served on him, between

the hours of ten and twelve of said day, unless said day falls on Sunday, and in that case, on the following day. At the time of the delivery of said deed by Penrose, the complainants will be required to pay the said $5,041.67, or to pay the $41.67, and to execute and deliver to Penrose the deed of release for the lots named. Neither party is entitled to costs.